## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **SYLVESTER LEWIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:18-CV-02209-MAB** |
| | ) | |
| **ANDY STOUT, KEVIN KINK, AND DR.** | ) | |
| **STEPHEN RITZ,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motions for summary judgment filed by Defendant Stephen Ritz (Doc. 87) and Defendants Andy Stout and Kevin Kink (Doc. 92). Defendant Ritz and Plaintiff have each filed motions to seal documents that accompany their briefing (Docs. 86 & 95). For the reasons explained below, the motions to seal (Doc. 86 & 95) are denied and the motions for summary judgment (Doc. 87 & 92) are granted.

### BACKGROUND

Plaintiff Sylvester Lewis ("Plaintiff") is an inmate under the care of the Illinois Department of Corrections who filed this lawsuit pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights (Doc. 1). Plaintiff alleges his cell was infested with ants; medical personnel had to remove bugs from his ears on several occasions; and he suffered from ear infections (*Id.*).

Following a preliminary review of Plaintiff's Complaint under 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on an Eighth Amendment claim against Defendants

Stout and Kink for being deliberately indifferent to the conditions of his cell (Count 1) and an Eighth Amendment claim against Defendant Ritz for being deliberately indifferent to his serious medical needs (Count 2) (Doc. 14).

Defendants filed motions for summary judgment (Docs. 87 & 92), Plaintiff filed motions in opposition (Docs. 97 & 99), and Defendants filed replies in support of their motions (Docs. 101 & 102). Defendant Ritz and Plaintiff filed motions to seal certain exhibits to their summary judgment briefing (Docs. 86 & 95).

### MOTIONS TO SEAL

Motions to seal are disfavored. *GEA Group AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 419 (7th Cir. 2014). "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Sprecht*, 622 F.3d 697, 701 (7th Cir. 2010). The Seventh Circuit has emphasized "that litigation be conducted in public to the maximum extent consistent with respecting trade secrets. . . and other facts that should be held in confidence." *Hicklin Eng'g, L.c. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006), *abrogated on other grounds by Americold Realty Trust v. Conagra Foods, Inc.*, 57 U.S. 378 (2016). Motions to seal parts of the record should be granted "only if there is good cause" for doing so. *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999)

Defendant Ritz and Plaintiff have each moved to seal exhibits. Although the motions are unopposed, they must still be scrutinized against the public's presumptive right of access to materials before the Court. *See Citizens*, 178 F.3d at 945 ("The judge is

the primary representative of the public interest in the judicial process and is duty-bound

therefore to review any request to seal the record (or part of it).").

Defendant Ritz moves to seal an exhibit to his motion for summary judgment that

contains screenshots of Wexford Health Source's, Inc.'s internal WexCare program (Doc.

86). Defendant Ritz argues the exhibit depicts a trade secret, as defined under the Illinois

Trade Secrets Act, 765 ILCS 1065/2(d) (the "Act"). The Act states that a trade secret is:

> information, including but not limited to, technical or non-technical data, a
> formula, pattern, compilation, program, device, method, [or]
> technique…that is sufficiently secret to derive economic value, actual or
> potential, from not being generally known to other persons who can obtain
> economic value from its disclosure or use and is the subject of efforts that
> are reasonable under the circumstances to maintain its secrecy or
> confidentiality.

*Id.*

In analyzing whether an alleged trade secret meets these requirement, Illinois

courts look to the following factors: "(1) the extent to which the information is known

outside of the [movant's] business; (2) the extent to which the information is known by

employees and others involved in the [movant's] business; (3) the extent of measures

taken by the [movant] to guard the secrecy of the information; (4) the value of the

information to the [movant's] business and to its competitors; (5) the amount of time,

effort and money expended by the [movant] in developing the information; and (6) the

ease or difficulty with which the information could be properly acquired or duplicated

by others." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir.

2003).

Here, the exhibit at issue equates to technical or non-technical data of Wexford's programs and methods for delivering healthcare. However, Defendant Ritz has not sufficiently addressed the other factors the Court must weigh to determine whether the exhibit constitutes a trade secret. For instance, Defendant Ritz argues that Wexford took reasonable steps to prevent the exhibit's disclosure by seeking a protective order in this case. However, the protective order functions to maintain the secrecy of sensitive materials produced during *discovery* and is not indicative of whether materials filed with the Court can be shielded from public view. *See* Doc. 83. The Protective Order states that the Court will make "an individualized determination of whether any such protected document(s) or information can be filed under seal" (*Id.* at ¶ 12). *See also Baxter Intern., Inc. v. Abbott Laboraties*, 297 F.3d 544, 545 (7th Cir. 2002) ("Secrecy is fine at the discovery stage, before the material enters the judicial record."); *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("While the public has a presumptive right to access discovery materials that are filed with the court…the same is not true of materials produced during discovery but not filed with the court.").

Otherwise, Defendant Ritz has not stated how, in practice, Wexford maintains the secrecy of its WexCare system; the extent to which the system is known outside of Wexford's business or to others involved in its business; the amount of resources Wexford has expended to develop the system; or the ease or difficulty with which the information could be properly acquired or duplicated. In fact, the WexCare system has been explained in at least one Seventh Circuit opinion. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 957 (7th Cir. 2019) ("If UM approved a patient for an offsite consultation

at UIC, the UM department would enter the information into Wexford's computer program ("WexCare"), which triggered an electronic notice to the prison and UIC. Then, the staff at IDOC and UIC would coordinate to schedule the inmate's appointment.").

Defendant Ritz argues that competitors could use the information depicted in the exhibit to elicit business away from Wexford by adapting and modifying Wexford's practices to attempt to create a "better" system (Doc. 86, p. 5-6). However, Defendant Ritz does not explain with sufficient particularity what is depicted in the exhibit that subjects Wexford to a potential harm. Instead, Defendant Ritz cites an Illinois circuit court case, which found that Wexford guidelines were exempt from disclosure because it was "clear" that Wexford had "gone to great time, and expense to develop their own specific protocols in how to treat most ailments that may arise in the inmate population" (Doc. 86-2). The Illinois court recognized,

> Providing health care to inmates in the Illinois Department of Corrections presents unique challenges that do not exist outside the walls of the penitentiary. These documents address how to provide health care to a prison population while recognizing many factors including: the dangers associated with violent inmates, the safety of the inmate, the safety of the health provider, and the safety of the correctional staff. To release these documents would cause [Wexford] competitive harm. In essence, it would allow any business wishing to compete with [Wexford] to see [Wexford's] proprietary business plan.

(*Id.* at p. 3).

This Court does not doubt that Wexford has expended significant resources in general in implementing its plan to provide inmate care within the IDOC. However, it is not obvious how the specific exhibit at issue here amounts to a trade secret. A party seeking to avoid disclosure must sufficiently explain how disclosure would cause harm

and why the predicted harm warrants secrecy. *See Baxter*, 297 F.3d at 547 ("Beyond asserting that the document must be kept confidential because we say so…this contends only that disclosure 'could…harm Abbott's competitive positions.' How? Not explained. Why is this sort of harm (whatever it may be) a legal justification for secrecy in litigation? Not explained."). Defendant Ritz has not established that good cause exists to seal the exhibit, such that Wexford's privacy interests outweigh the interests of the public in full transparency of the judiciary. Accordingly, Defendant Ritz's Motion to File Summary Judgment Exhibits Under Seal (Doc. 86) is DENIED.

Plaintiff has also filed a motion to file a summary judgment exhibit under seal (Doc. 95). Plaintiff notes that the protective order "states that a party wishing to file a protected document shall file a motion to do so under seal," the exhibit at issue "is a protected document, in that it is stamped 'confidential and subject to Protective Order,'" and "plaintiff is thus compelled to seek leave to file the attached exhibit under seal" (*Id.*). Plaintiff's motion does not explain any basis for permitting the exhibit to be filed under seat. "Motions that simply assert a conclusion without the required reasoning…have no prospect of success." *Baxter*, 297 F.3d at 548. Accordingly, Plaintiff's Motion to File Summary Judgment Exhibit Under Seal (Doc. 95) is DENIED.

<u>SUMMARY JUDGMENT MOTIONS</u>

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient

evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## Undisputed Material Facts[1]

---

[1] Plaintiff objects to Defendant Ritz's statement of fact number 18 as speculative. The statement of fact states, "Dr. Ahmed would have been aware he could re-present Lewis's case to collegial, but he did not do so." This statement of fact is only supported by Defendant Ritz's testimony of what he believes Dr. Ahmed knew. "[E]vidence supporting a factual assertion must represent admissible evidence." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). Because Defendant Ritz's testimony is pure speculation, it is inadmissible and Plaintiff's objection is sustained.

Plaintiff's additional fact number 18 provides: "Plaintiff was told by staff at the Lawrence medical unit that defendant Kink did not want plaintiff to contact defendant Kink" (Doc. 99, p. 5). This statement constitutes hearsay, which is inadmissible on summary judgment to the same extent it would be inadmissible at trial. *Eisenstadt v. Centel Corp.*, 114 F.3d 738, 742 (7th Cir. 1997). Accordingly, it is not considered.

Also, Defendants Stout and Kink cite Plaintiff's deposition testimony to support statements of fact numbers four, five, and seven (*See* Doc. 92, p. 2). In response, Plaintiff attempts to dispute these facts by pointing to Defendant Stout's testimony that he does not recall certain events. However, a statement that one does not recall is insufficient to create a genuine issue of material fact. *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011). Accordingly, these facts are undisputed for purposes of summary judgment.

Further, Defendants Stout and Kink's statement of fact number 31 states Plaintiff was disciplined for fermenting fruit and/or "hooch" (Doc. 92, p. 5). Defendants cite to Exhibit G (Doc. 92-7) which is an IDOC pest control contract—not Plaintiff's disciplinary records. Regardless, the evidence appears to be

A. **Living Conditions**

Defendant Stout was a correctional officer employed at Lawrence, where Plaintiff

resided during times relevant to this lawsuit (Doc. 1, p. 1 & 9). Plaintiff testified that on

March 23, 2018, he informed Defendant Stout that he had problems with his cellmate and

requested a new cell (Doc. 92-2, p. 93, 95, & 96). That same day, Plaintiff was moved from

cell 24 of Lawrence's 7 House to cell 14 (Doc. 92-2, p. 93 & 95).

When Plaintiff arrived at cell 14, there were ants on the floor (Doc. 92-2, p. 94).

Plaintiff testified that Defendant Stout ordered another inmate to clean cell 14 with bleach

before Plaintiff moved in, which temporarily removed the ants (Doc. 92-2, p. 94, & 96-98).

However, the ants soon returned (*Id.* at p. 98). At some point, Plaintiff told Defendant

Stout that the ants were back, but it is unclear as to when or on how many occasions he

alerted Defendant Stout.

Plaintiff initially testified the ants "start[e]d coming back out when I went to chow.

So I addressed it again [with Defendant Stout]" and "[h]e told me to stop crying like a

baby" because they were "not going to kill or hurt you" (*Id.* at p. 98). Later, Plaintiff

testified, "[W]hen I came off of chow and I told him about it again, he told me to stop

---

irrelevant because the parties agree that Plaintiff did not cause the ant infestation and Defendants do not
argue Plaintiff was found fermenting hooch in the cell at issue here. Accordingly, the statement of fact is
unsupported and irrelevant.

Also, Defendant Ritz moves to strike Plaintiff's statement of additional facts numbers 55 through 64, which
relate to Plaintiff's medical history following Defendant Ritz's involvement with Plaintiff's care. Defendant
Ritz argues the evidence does not relate to an issue of fact because Plaintiff's only claim against Defendant
Ritz is that he vetoed a referral request. Evidence of Plaintiff's subsequent diagnoses and treatments may
be relevant to whether Defendant Ritz's delay in addressing or approving the ENT referral request caused
Plaintiff harm. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019). Thus, the Court
declines to strike the additional facts.

crying" (*Id.* at p. 102). Then, Plaintiff testified, "I told him…when I came off of dayroom…I said, man, the ants came back out. He told me stop crying like a baby. They ain't nothing. They small ants. They are not going to hurt you" (*Id.* at p. 104). Later, Plaintiff was asked, "After you had that conversation where you told CO Stout that the ants were coming back, did you have other conversations with him about ants?" (*Id.* at p. 110). Plaintiff answered, "I told him that first time he didn't do nothing about it. I went to the lieutenant, and that was the last time I seen him" (*Id.*). Plaintiff was asked, "You didn't see Officer Stout after you told him that the ants were back?" (*Id.*). Plaintiff responded, "Uh-uh," which he confirmed was a "no" (*Id.*).

Plaintiff testified that when he talked to Defendant Stout, they could not see the ants from where they were standing (*Id.* at p. 107).  Plaintiff did not tell Defendant Stout how many ants were in the cell but did say that there were "a lot" (Doc. 92-2, p. 108).

 After speaking to Defendant Stout, Plaintiff talked to a non-party lieutenant, who said he was going to give Plaintiff cleaning supplies (*Id.* at p. 103). However, Plaintiff did not receive cleaning supplies and when he laid down for the evening, ants crawled over his bed and in his ear (*Id.*). Plaintiff went to the Health Care Unit and medical personnel removed ants from his ear (*Id.*). Before Plaintiff went to sleep, a lieutenant gave Plaintiff bleach to clean his cell (*Id.* at p. 120). Ants crawled in Plaintiff's ears again and he went back to the Health Care Unit to have them removed (*Id.* at p. 103 & 121). A nurse requested that Plaintiff be moved to a new cell and Plaintiff was relocated from cell 14 on March 26, 2018, after being there for approximately three days (Doc. 92-2, p. 102) (Doc. 92-1, p. 2).

After Plaintiff filed this lawsuit, he had a conversation with Defendant Stout during which Defendant Stout told Plaintiff it was not his job to make sure the cells were clean or not infested and that he did his job by moving Plaintiff to cell 14 and having an inmate clean cell 14 (Doc. 92-2, p. 138-39).

On March 26, 2018, Plaintiff submitted a grievance about "bugs" in his cell (Doc. 92-4, p. 39). The grievance states Plaintiff told a correctional officer about the bugs on March 23, 2018, but the correctional officer said he could not do anything about the situation (*Id*.). According to the grievance, on March 24, 2018, Plaintiff told a correctional officer about the bugs and the officer told Plaintiff to stop crying (*Id*.). The grievance states that on March 25, 2018, Plaintiff told Correctional Officer Hope about the bugs, who responded he would try to move Plaintiff away from the cell (*Id*.). Plaintiff also told the lieutenant assigned to the cell house about the bugs (*Id*.). The grievance also states that Plaintiff had bugs in his ears, he told a correctional officer he needed medical attention, the officer contacted the Health Care Unit for Plaintiff, and a lieutenant walked Plaintiff to the Health Care Unit (*Id*. at p. 40). Plaintiff went back to the Health Care Unit on March 26, 2018 to have more bugs removed from his ears (*Id*.).

Defendant Kink reviewed the grievance on March 28, 2018 (Doc. 92-4, p. 26 & 45). The grievance was deemed a non-emergency with the instruction that it should be re-submitted in the normal manner (*Id*. at p. 26 & 41) (Doc. 92-5, p. 39). A grievance counselor subsequently reviewed and responded to the grievance by stating Plaintiff was moved to a different cell on March 26, 2018 and was seen in the Health Care Unit on March 25, 2018 and March 26, 2018 (Doc. 92-5, p. 39).

On July 7, 2018, Plaintiff submitted a grievance about a black bug in his ear and he sought a referral to an outside ear doctor (Doc. 92-5, p. 33-34). The grievance was received on July 19, 2018 and Defendant Kink reviewed the grievance on July 20, 2018 and deemed it a non-emergency (*Id.*) (Doc. 92-4, p. 28). The grievance was re-submitted and subsequently reviewed by the grievance counselor (Doc. 92-5, p. 33).

Plaintiff testified that he wrote Defendant Kink a letter about the ants and Defendant Kink wrote back that an exterminator visited Lawrence every two weeks (Doc. 92-2, p. 124). Plaintiff also spoke to Defendant Kink on one occasion (*Id.* at p. 132). Plaintiff testified: "He told me he was going to look into the situation. He never sent nothing back to me about anything. And I never heard nothing else from him" (*Id.*). Plaintiff further testified, "He didn't respond—he never got back to me. He got back to the nurses. And they reached out to me calling me to health care…" (*Id.* at p. 135).

Defendant Kink testified that he would deem grievances a non-emergency when the issue needed to be addressed but did not constitute a life-or-death emergency situation (Doc. 92-4, p. 40). Defendant Kink testified he would generally call the Health Care Unit and request the individual be seen if something could be quickly addressed, even if he deemed the grievance a non-emergency (*Id.* at p. 29). When an emergency grievance was submitted, it was referred to the Warden's office for review by the Warden or Assistant Warden, who would determine if the grievance should be deemed an emergency or not (*Id.* at p. 15). Defendant Kink stated that when he received correspondence about the presence of bugs, he would call the chief engineer to have

someone go check the allegations and/or follow up with the pest control company (*Id.* at p. 17-18).

Lawrence contracted with a pest control agency and Defendant Kink testified the agency was at Lawrence every month but would come out more often, as needed (*Id.* at p. 18). However, another inmate submitted an affidavit that stated in the one-and-a-half years prior to the filing of Plaintiff's Complaint, an exterminator did not spray the cells (Doc. 93-3, p. 2).

Defendant Stout testified that his general practice in the event of an insect complaint would be to allow the individual to clean his cell by providing cleaning supplies (Doc. 92-3, p. 5). Defendant Stout stated there were occasionally ants at Lawrence, but the quantity was "no different than in your house" (*Id.*). However, Plaintiff testified the volume of ants in his cell was equivalent to the size of half of an eight-and-a-half by eleven-inch piece of paper (Doc. 92-2, p. 101-02). Also, Plaintiff testified three or four moths would occasionally fly into the cell house and/or cells (Doc. 92-2, p. 116-17 & 129-30). Plaintiff generally alleges that Lawrence was "very infested with bugs and mice and stuff" (*Id.* at p. 114). Another inmate submitted an affidavit that states rodents, ants, moths, beetles, and crickets have been in the dining area, housing units, and in inmate's personal space at Lawrence (Doc. 99-4). Plaintiff concedes he never had mice, rats, or flies in his cell (Doc. 92-2, p. 117).

Plaintiff testified there was nothing in his cell to attract ants (Doc. 92-2, p. 121). The parties agree that Plaintiff did not cause the ant infestation.

B.  **Medical Treatment**

From September 2014 to July 2020, Defendant Ritz was a corporate utilizations management medical director servicing the Illinois Department of Corrections contract with Wexford Health Sources, Inc. (Doc. 88-1, p. 14, 15, 19, & 20). Defendant Ritz's office is in Pittsburg, Pennsylvania and he has never been to Lawrence or treated Plaintiff in person (*Id.* at p. 15 & 23).

On January 10, 2018, Plaintiff reported to sick call at Lawrence with complaints of ear pain, which he stated was at a level of ten out of ten. The nurse detected cerumen (ear wax) and prescribed acetaminophen and Debrox (ear drops for softening ear wax) (Doc. 88-1, p. 70-72).

On February 15, 2018, a doctor at Lawrence examined Plaintiff, who complained his left ear infection had returned. Whiteish discharge was observed. Plaintiff's diagnoses included otitis externa and he was prescribed Nasacort, Cortisporin ear drops, and Hydrocerin ear drops (Doc. 88-1, p. 72-74). Acute otitis media is an acute suppurative (pus-producing) infectious process marked by the presence of infected middle ear fluid and inflammation of the mucosa lining of the middle ear space (*Id.* at p. 26).

On March 7, 2018, Plaintiff reported to sick call at Lawrence with complaints of ear pain and drainage. Nurse Practitioner Sara Stover saw Plaintiff and her objective findings included erythema (reddening), swelling, and ear wax impaction. Plaintiff's diagnosis included otitis media and cerumen impaction. He was prescribed Ibuprofen and Amoxicillin (an antibiotic) (Doc. 88-1, p. 76-78).

On March 21, 2018, Plaintiff had a follow-up visit with Nurse Practitioner Stover for otitis media. Plaintiff's subjective complaints included continued ear pain, fullness in the ears, and noise in the ears. Earwax impaction and fluid in the ears was observed. Plaintiff was diagnosed with serous otitis. Plaintiff was prescribed Ibuprofen, Nasacort, Claritin, Benadryl, and Debrox ear drops (Doc. 88-1, p. 78-79). Defendant Ritz did not recall seeing this medical record prior to his deposition (*Id.* at p. 78).

On March 25, 2018, Plaintiff reported to sick call at Lawrence with ear pain at a level eight out of ten with green drainage. His ear canals were observed to be red and slightly swollen. (Doc. 88-1, p. 74-75). Defendant Ritz testified he did not recall seeing this medical record prior to his deposition (*Id.* at p. 75).

On March 26, 2018, Plaintiff reported to the medical unit at Lawrence with reports of ants in his ears. The nurse noted the presence of ants in both ears and flushed them with warm water (Doc. 88-1, p. 80-81).

Plaintiff sometimes put tissues in his ears to prevent insects from crawling into his ears (Doc. 97-3, p. 2).

On April 19, 2018, Nurse Practitioner Stover saw Plaintiff and noted that both ears had erythema and swelling with dried drainage in the right ear. She diagnosed Plaintiff with complicated otitis media and prescribed him a new antibiotic, Ceftriaxone, to be administered by intramuscular injection, and ear drops (Doc. 88-1, p. 83-84).

On May 3, 2018, Plaintiff saw Nurse Practitioner Stover at a follow-up appointment for otitis media. Plaintiff reported drainage and tenderness. It was noted that both ears were tender and the left ear had mild erythema (Doc. 88-1, p. 84-85).

On May 10, 2018, Plaintiff's right ear was flushed (*Id.* at p. 85).

On May 11, 2018, Plaintiff presented to Nurse Practitioner Stover at Lawrence's medical unit and she noted Plaintiff had a cloudy tympanic membrane (ear drum) and mild erythema in the right ear (Doc. 88-1, p. 86-87).

On May 17, 2018, a nurse at Lawrence treated Plaintiff because he reported the Claritin was not working (Doc. 88-1, p. 87).

On May 21, 2018, Nurse Practitioner Stover saw Plaintiff and noted erythema in the right ear, cloudy tympanic membrane, and tenderness (Doc. 88-1, p. 88).

On May 25, 2018, Plaintiff reported to the Lawrence medical unit with a black bug, on inch long and a quarter inch wide, which he said came from his right ear (Doc. 88-1, p. 89).

On June 19, 2018, Plaintiff was treated at Lawrence's medical unit, where he was found to have large amounts of ear wax and a slightly swollen and red right ear (Doc. 88-1, p. 90).

On June 22, 2018, Nurse Practitioner Stover treated Plaintiff and removed a bug from his ear using ear wash. She prescribed Plaintiff Ibuprofen and the antibiotic Augmentin (Doc. 88-1, p. 90).

On June 28, 2018, Nurse Practitioner Stover treated Plaintiff and observed mild erythema in both ears. She diagnosed Plaintiff with otitis media (Doc. 88-1, p. 91).

On July 15, 2018, a nurse at Lawrence treated Plaintiff, who complained of ear pain at a level of eight out of ten. Ear wax and slight swelling of the right ear was noted (Doc. 97-2, p. 18).

On July 17, 2018, Nurse Practitioner Stover treated Plaintiff, who reported both of his ears were hurting but the right hurt more than the left. Right ear redness and swelling and left ear redness was noted. Nurse Practitioner Stover stated Plaintiff had been treated with at least six different antibiotics over the past six months (Doc. 88-1, p. 93-94). She submitted a non-urgent request for consultation with an otolaryngologist ("ENT") regarding Plaintiff's history of ear infections (Doc. 88-2, p. 2). An ENT is a physician specializing in the treatment of the ear, nose, and throat (Doc. 88-1, p. 25).

When there is a request for an outside medical referral, Wexford addresses the request through a process known as a collegial review (Doc. 95-1). The collegial process serves two primary functions: review of outside referral requests and to allow Illinois correctional clinicians resources to discuss their medical cases with other providers (Doc. 88-1, p. 50-51).

On July 19, 2018, Defendant Ritz reviewed the non-urgent request for ENT referral and asked Lawrence to provide Plaintiff's current exam findings, what antibiotics Plaintiff had been treated with, and whether any of those antibiotics were for direct observation therapy ("DOT") (Doc. 88-1, p. 101).[2] Defendant Ritz did not approve the ENT request (*see* Doc. 89-1, p. 4). The Wexford document prepared for the collegial review process states:

> 7-19-18 Received request for ENT eval r/t a 38 y/o male who had multiple ear infections since March and has been treated with oral and IM antibiotics

---

[2] DOT means an inmate goes to the medical line to receive his medications and is used to ensure adherence to a medication treatment regime (Doc. 88-1, p. 101-2). Knowing whether a full medication course was completed is especially important with antibiotics to evaluate their efficacy (*Id.*). Defendant Ritz testified, "assuming that the antibiotics here would not have made it to DOT, that would not have violated any rule or policy or regulation from Wexford" (*Id.* at p. 102).

as well as ear drops. He has a long history of complicated ear infections and hearing loss is a risk factor if the ear infections continue this frequently. Reviewed by Dr. Ritz and ATP'd to re-present with the current exam findings, what antibiotics he has been treated with and if the antibiotics were DOT.

(Doc. 89-1, p. 4).

Defendant Ritz's July 19, 2018 directive denying an ENT referral did not occur in the context of a collegial, as there was no collegial call on that date (Doc. 88-1, p. 106-07).

Wexford maintains written Utilization Management Guidelines that specify procedures for collegial review. Those procedures state, in part:

2. Prior to the scheduled weekly Collegial Review the consult coordinator is to obtain the medical records for that day's Collegial Review. A list of cases to be discussed should be forwarded to the Wexford Health Utilization Management Department (UM Department) no later than 24 hours prior to the Collegial Review along with all supporting documentation including, but not limited to ECG's, labs, previous studies and procedures, prior consultation notes, etc. Each Referral Request form should clearly list specific service being requested (e.g., consultation visit for recommendations, radiological test, surgical procedure). The submission of the request occurs at the point where all of the appropriate documentation has been gathered and presented at the UM Medical Director, usually the day of the collegial review. This allows for complete knowledge and background of the case and prevents unnecessary delay due to insufficient information.

(Doc. 95-1).

Dr. Faiyez Ahmed was the medical director or the acting medical director of Lawrence during the relevant time (Doc. 88-1, p. 109). On July 26, 2018, Dr. Ahmed re-presented Plaintiff's case to Defendant Ritz in collegial review but Plaintiff had not been re-evaluated on-site and his medications had not been ordered DOT (Doc. 88-2, p. 5-6) (Doc. 89-1, p. 4). Defendant Ritz and Dr. Ahmed agreed to the alternative treatment plan

Page 17 of 42

("ATP") to re-evaluate Plaintiff and re-present Plaintiff to collegial the following week (*Id*.).

On August 1, 2018, Plaintiff presented to the medical unit at Lawrence with complaints of ear pain. An LPN examined Plaintiff and noted that his right tympanic membrane was red and shiny and the right ear was swollen (Doc. 88-1, p. 110-11).

On August 2, 2018, the request that Plaintiff be evaluated by an ENT was re-presented at a collegial. As of August 2, 2018, Plaintiff had not been re-evaluated by Dr. Ahmed, so the matter was to be presented at a later collegial (Doc. 88-1, p. 112-13).

On August 3, 2018, Dr. Ahmed examined Plaintiff, who reported his ears were hurting. According to Dr. Ahmed's report, Plaintiff's tympanic members were clear with low light reflection, his nasal mucosa were pale and boggy with mucoid discharge, and he had marked tenderness of both sides of his temporomandibular joint ("TMJ"). Dr. Ahmed diagnosed Plaintiff with bilateral TMJ symptoms secondary to buxism (teeth grinding), allergic rhinitis, and eustachian tube dysfunction. Dr. Ahmed prescribed Plaintiff Ibuprofen, recommended he not grind his teeth, stay calm, avoid anger and stress, and return to the clinic in four weeks (Doc. 88-2, p. 8-9). Plaintiff testified that Dr. Ahmed told Plaintiff that Plaintiff had TMJ from grinding his teeth (Doc. 97-3, p. 3-4 & 6). Plaintiff denies that he grinded his teeth (*Id*.). Plaintiff testified he was never diagnosed with TMJ prior to Dr. Ahmed's August 3, 2018 diagnosis (*Id*. at p. 6).

According to an UpToDate article, a TMJ diagnosis is based primarily upon clinical history and physical exam findings (Doc. 88-1, p. 37 & 40). The article states that relevant factors include facial pain; jaw symptoms; ear symptoms; pain in the head, neck,

shoulder, and upper back; a history of previous TMJ surgery or trauma; a history of arthritis; history of habits such as pencil biting, gum chewing, or clenching, gritting, or grinding the teeth; hobbies or occupational factors; teeth grinding; depression and anxiety; and sleep quality.[3] The article further provides that a physical examination to detect TMJ may include: asking the patient to open/close hi/her mouth to observe any jaw deviation or protrusion and to check for teeth alignment; measuring the distance between the incisal edges of the upper and lower teeth when the patient's mouth is opened as wide as possible; palpitation of muscles of mastication to check for tenderness and joint crepitus (clicking or crunching); instructing the patient to bite down to check for pain; evaluation for bruxism; assessment of upper body and neck posture; and assessment of the muscles of the neck and shoulders. However, Defendant Ritz testified the article "does not apply to all patients and all context[s] and all situations. Every patient and their situation is different and it needs to be individually reviewed" (Doc. 88-1, p. 31).

Defendant Ritz testified he did not know if there was evidence of the factors identified in the article in Plaintiff's medical records, "But I would stipulate I have not reviewed his entire medical record" (Doc. 88-1, p. 41-42).

---

[3] Plaintiff's statement of additional facts cites the article as "Ex. 3 to Ritz Depo." (Doc. 97, p. 4, ¶ 7 & 9), but the record before the Court does not contain the cited article. However, Defendant Ritz admits that Plaintiff's statement of additional facts accurately quotes the article (Doc. 100, p. 2-3). Further, Defendant Ritz's deposition transcript contains the recitation of relevant portions of the article and he stated he is familiar with the source of the article (*See* Doc. 88-1, p. 26, 39-40, 42-43, & 45). Because Defendant Ritz does not dispute the contents of the cited portions of the article and the article is not dispositive to the outcome of the case, the Court will consider the evidence.

TMJ would not result in whiteish discharge, swelling, erythema, green drainage, or red or swollen ear canals and is not associated with ear wax impaction and fluid in the ears (Doc. 88-1, p. 73, 75, 77, & 79). However, Defendant Ritz testified the marked tenderness of Plaintiff's TMJ was an important clinical factor in diagnosing Plaintiff's TMJ dysfunction (Doc. 88-1, p. 124). Dr. Ahmed's notes from the August 3, 2018 examination do not reflect that he performed the following diagnostic steps to detect TMJ: examination of teeth to detect bruxism; measuring distance between upper and lower teeth; palpitation of muscles of mastication; checking for pain when biting; assessment of neck and shoulder posture and muscles; or checking for jaw deviation or teeth protrusion (*see* Doc. 97-2, p. 25-26). However, Defendant Ritz testified, "[A]s is often the case, just because something is not documented in a record doesn't mean that it wasn't done" (Doc. 88-1, p. 121).

On August 6, 2018, Plaintiff presented to Lawrence's medical unit with ear pain (Doc. 97-2, p. 27).

On August 9, 2018, Plaintiff' case returned to collegial. Dr. Ahmed told Defendant Ritz that Plaintiff had a TMJ problem and had no current need for an ENT. Defendant Ritz advised Lawrence that it could re-present Plaintiff's case to collegial as need ("PRN") (Doc. 88-2, p. 10). The August 9, 2018 decision to withdraw the ENT request was based on on-site medical director Dr. Ahmed's recommendations and findings (Doc. 88-1, p. 118, 119, & 161). Defendant Ritz testified the findings appeared to be clinically appropriate (*Id.* at p. 119).

After August 9, 2018, Lawrence did not re-present Plaintiff's case to Defendant Ritz (Doc. 88-1, p. 160-61).

Defendant Ritz testified that he does not direct the decision of on-site clinical staff because on-site clinic staff, such as Dr. Ahmed, are the ones examining the patients in person (Doc. 88-1, p. 162).

On August 15, 2018, Plaintiff presented to Lawrence's medical unit with ear pain and the objective findings included the right ear being full of wax (Doc. 88-1, p. 127-28).

On August 16, 2018, Nurse Practitioner Stover examined Plaintiff and noted his let ear was red. Plaintiff complained of left ear pain (Doc. 97-2, p. 29).

On August 29, 2018, Plaintiff received an x-ray of his TM joint. The x-ray report notes that open and closed mouth views were not performed and that while cross-sectional imaging is a more sensitive means of detecting TMJ, it was not done (Doc. 88-1, p. 130-31) (Doc. 97-2, p. 30).

On October 12, 2018, Plaintiff presented to Lawrence's medical unit with complaints of ear pain and mild right ear hearing loss (Doc. 88-1, p. 132).

On October 22, 2018, Nurse Practitioner Stover treated Plaintiff and noted right ear erythema and diagnosed Plaintiff with otitis media (Doc. 88-1, p. 132-33).

On November 7, 2018, Nurse Practitioner Stover treated Plaintiff to follow-up with his ear pain and diagnosed Plaintiff with otitis media (Doc. 88-1, p. 133-34).

Plaintiff as transferred from Lawrence to Pontiac and was seen at the Pontiac medical unit on July 13, 2019. Objective findings included inflammation and outward

bulging of the right eardrum. Plaintiff was diagnosed with otitis media (Doc 88-1, p. 134-35).

On September 6, 2019, Plaintiff was seen at the Pontiac medical unit with a report of ear pain at an eight out of ten. Plaintiff's ear drum was gray and the hearing screen reflected abnormal findings (Doc. 88-1, p. 136-37).

As a result of a settlement in a prior class action litigation known as the *Holmes* settlement, inmates with abnormal onsite hearing screenings were referred to an outside audiologist (Doc. 88-1, p. 139-40). Plaintiff was sent to Steinwart Audiology for an off-site hearing examination. The exam reflected Plaintiff's ear drums were cloudy and scarred. Plaintiff was detected as having moderate to severe hearing loss in both ears. It was recommended that Plaintiff receive hearing aids for both ears. The findings in the hearing exam were consistent with hearing loss. Plaintiff has sustained permanent hearing loss and utilizes hearing aids in both ears. (Doc. 88-1, p. 141-43).

On June 9, 2015, Defendant Ritz approved an orthopedic evaluation off-site for Plaintiff's fractured left index finger (Doc. 89-1, p. 11). On January 21, 2016, Defendant Ritz approved an off-site cataract evaluation for Plaintiff. He also approved an off-site orthopedic follow-up at UIC for Plaintiff's fractured finger (*Id.* at p. 9-10). On July 12, 2016, Defendant Ritz approved an off-site orthopedic follow-up appointment for Plaintiff's fractured finger (*Id.* at p. 8). On February 14, 2017, Defendant Ritz approved another off-site orthopedic follow-up appointment for Plaintiff's finger (*Id.* at p. 7). On August 31, 2017, Defendant Ritz approved Plaintiff for an off-site optometry evaluation on referral request from Dr. Ahmed related to Plaintiff's reports of photophobia and

trouble seeing (*Id.* at p. 6).[4] On September 20, 2019, Defendant Ritz approved Plaintiff to see an off-site audiologist after an on-site hearing screening returned abnormal results (*Id.* at p. 3 & 11).

**Analysis**

The Constitution does not mandate comfortable prisons, but it mandates humane ones. *Thomas v. Blackard*, 2 F.4th 716, 729 (7th Cir. 2021) (internal citations and quotations omitted). "By prohibiting cruel and unusual punishment, the Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care." *Id.* Prison officials who fail to uphold these duties violate the Eighth Amendment "upon exhibiting deliberate indifference to a substantial risk of serious harm to an inmate." *Id.*

Deliberate indifference includes "both an objective and subjective component." *Id.* An inmate who challenges his conditions of confinement "must first show that the conditions were sufficiently serious as an objective matter, meaning that they denied the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety." *Id.* (internal alterations omitted). "Second, in covering the subjective component of the inquiry, the inmate must prove that prison officials acted with deliberate indifference—that they knew of and disregarded this excessive risk of harm to the inmate." *Id.*

A.    **Defendants Stout and Kink**

---

[4] Authorization was cancelled later due to Plaintiff being examined on-site (Doc. 89-1, p. 7).

Plaintiff alleges Defendants Stout and Kink were deliberately indifferent to his living conditions when he was placed in an ant-infested cell from March 23, 2018 to March 26, 2018. Also, Plaintiff states there were mice, rats, beetles, moths, crickets and flies in various areas of the prison.

The Seventh Circuit has recognized that prolonged pest infestations in an inmate's living environment can amount to a constitutional violation. *See Sain v. Woods*, 512 F.3d 886, 894 (7th Cir. 2008). When assessing conditions of confinement claims, courts should consider the length and severity of the condition, *see Sain*; whether pests came in contact with the plaintiff, bit the plaintiff, or caused the plaintiff physical or psychological harm, *see Smith v. Dart*, 803, F.3d 304, 312 (7th Cir. 2015); and whether the plaintiff had the ability to address the conditions himself, *see Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997) (considering whether an inmate had alternative means to protect himself from the cold).

For example, in *Sain*, the Seventh Circuit granted summary judgment in favor of a prison where an inmate alleged he saw "several" cockroaches and was bitten twice throughout his six-year confinement, because while "certainly unpleasant," the conditions of confinement were not objectively serious enough to establish a constitutional violation. *Id.* Further, an exterminator treated the prison every six weeks or so and additionally on request. *Id.* In *Bentz v. Hardy*, 638 F. App'x 535, 537 (7th Cir. 2016), the Seventh Circuit found an inmate's claim withstood summary judgment where for six months, "the cell was so infested with cockroaches and earwigs that, despite [the plaintiff] killing nearly 50 a day, the insects continued to crawl on him at night, keeping him awake." In *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996), the Seventh Circuit

reversed the dismissal of an Eighth Amendment claim where the plaintiff alleged that for sixteen months, cockroaches were "everywhere," "crawling on his body," along with mice, and "constantly awaken[ing]" him and causing the environment to be unsanitary. In *White v. Monohan*, 326 F. App'x 385, 387 (7th Cir. 2009), the Court found a prisoner stated a claim where he alleged that for "over five years, the bugs, roaches, spiders, wasps, and bees had bitten and stung him so often as to leave multiple scars, wounds, and sores, causing him internal injuries." (internal quotations and alterations omitted). However, the Court pointed out that it was a "close case." *Id.*

Here, Plaintiff testified there were ants in the cell that he lived in for approximately three days, from March 23, 2018 to March 26, 2018. The volume of the ants was equivalent to the size of half of an eight-and-a-half by eleven-inch piece of paper. The ants crawled in Plaintiff's ears at night and he had to seek medical attention to have them removed on two occasions. Plaintiff had a history of ear infections during this time and ultimately sustained permanent hearing loss. Also, Plaintiff testified four moths flew in his cell. Another IDOC inmate submitted an affidavit that states there were mice, rats, beetles, and crickets around living areas at Lawrence. Plaintiff concedes he never encountered mice, rats, or flies in his cell.

The facts of this case present unpleasant but not unconstitutional living conditions. Plaintiff has not adduced any evidence that he encountered any pest other than ants and moths during the relevant times. The affidavit that states vermin and other pests occupied Lawrence's living areas is not evidence that Plaintiff was personally subjected to these conditions. *See Harris v. Baldwin*, 2018 WL 2389739, at *5 (S.D. Ill. May 25, 2018)

(dismissing deliberate indifference claim because the plaintiff alleged "that prisoners must take cold showers, but never allege[d] that he himself has taken a cold shower or suffered a harm as a result.").

Otherwise, Plaintiff was in an ant-infested cell and saw four moths over the course of approximately three days. This is far less than the periods of time where courts have recognized objectively serious living conditions. *See Antonelli*, 81 F.3d at 1431 (sixteen-months); *White*, 326 F. App'x at 387 (five years); *Bentz*, 638 F. App'x at 537 (six months). Although the ants crawled on Plaintiff and in his ears, during the three days Plaintiff was in the cell, the cell was bleached to remove the ants right before Plaintiff moved in, soon after a lieutenant gave Plaintiff cleaning supplies to remove the ants, Plaintiff received prompt medical care to remove the ants from his ears, and Plaintiff was moved away from the cell. *See Osborne v. Meisner*, 2018 WL 1953926, at *7 (E.D. Wis. Apr. 25, 2018) (granting summary judgment in favor of defendants where the plaintiff argued he was bitten by bugs in his cell for one and a half weeks); *Jones v. Dittman*, 2020 WL 224341, at *3 (W.D. Wis. Jan. 15, 2020) (dismissing Eighth Amendment claim where the plaintiff alleged he was bitten by bugs for a week and received medical care for the bites but the conditions only lasted for seven days, which was "much shorter than those recognized by the Court of Appeals").

But even if Plaintiff's living conditions were inhumane, no reasonable jury could find Defendants Stout or Kink were deliberately indifferent. When Plaintiff arrived at cell 14, there were ants on the floor. Plaintiff testified that Defendant Stout ordered another

inmate to clean the cell with bleach before Plaintiff moved in, which temporarily removed the ants. At some point, Plaintiff told Defendant Stout there were still "a lot" of ants in his cell but Defendant Stout could not see Plaintiff's cell from where the conversation took place. Defendant Stout told Plaintiff to stop crying like a baby. Plaintiff told Defendant Stout about the ants on one other occasion.

This evidence is insufficient to raise a genuine question that Defendant Stout was deliberately indifferent. When Defendant Stout first became aware of the presence of ants in Plaintiff's cell, he reasonably responded by ordering another inmate to bleach the cell. This does not constitute deliberate indifference. "[P]rison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).

Plaintiff's descriptions of his other interactions with Defendant Stout do not raise an inference that Defendant Stout knew about unconstitutional conditions. Plaintiff bears the burden of demonstrating that his communications, in their contents and manners of transmission, gave Defendant Stout sufficient notice to alert him to an excessive risk to Plaintiff's health or safety. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). Plaintiff told Defendant Stout there were "a lot" of ants his cell and he told Defendant Stout about the ants "again" at a later time. The Court simply cannot conclude that these vague communications put Defendant Stout on notice that Plaintiff was living in unconstitutional conditions. Further, although Defendant Stout told Plaintiff to "stop

crying like a baby," "rudeness does not violate the Eighth Amendment." *Harris v. Horney*, 948 F.2d 1292 (Table) (7th Cir. 1991).

Plaintiff's evidence against Defendant Kink is similarly deficient. Defendant Kink reviewed two of Plaintiff's grievances on March 28, 2018 and July 20, 2018. At this point, Plaintiff had already been moved from cell 14 and Defendant Kink deemed the grievances non-emergencies. Because Plaintiff had already moved cells, Defendant Kink could not have believed that the conditions posed an excessive risk to Plaintiff's health or safety or done anything to remedy the situation. *See White v. McAdory*, 2011 WL 1238908, at *11 (C.D. Ill. March 30, 2011) ("Plaintiff admits that he did not write any of the letters or grievances until after he was out of [Special Management Unit], and had already received toilet paper. There is insufficient evidence for a rational jury to find that defendants were aware that Plaintiff was subjected to inhumane conditions in the Special Management Unit during the time he alleges it was occurring, and when they could have done something about it."); *Weaver v. Martija*, 2020 WL 1304873, at *10 (N.D. Ill. March 19, 2020) ("It is not clear what, if any, additional corrective action [the defendants] could have taken as the relief [the plaintiff] requested in this grievance had already been granted."); *Overturf v. Wexford Health Sources*, 2020 WL 6826805, at *9 (S.D. Ill Nov. 20, 2020) ("[B]y the time Defendant…responded to Plaintiff's grievance in January, he already had his medication refill. Accordingly, Defendant…is entitled to summary judgment.").

Also, Plaintiff testified he wrote Defendant Kink a letter about the ants and Defendant Kink wrote back that an exterminator visited Lawrence every two weeks.

There is a dispute of fact as to whether an exterminator ever visited Lawrence during the relevant period, but Plaintiff does not argue or cite evidence that Defendant Kink knew there was no exterminator visiting the facility. Also, Plaintiff stated he spoke to Defendant Kink on another occasion.

Plaintiff does not provide any additional details about the timing or contents of his communications with Defendant Kink. Without more, no rational jury could find the communications alerted Defendant Kink that Plaintiff was living in inhumane conditions. Even when viewing the light most favorable to Plaintiff, Plaintiff has not raised a genuine dispute of material fact that Defendants Stout or Kink were deliberately indifferent. Thus, Defendants Stout and Kink are entitled to summary judgment. Because Defendants Stout and Kink did not violate Plaintiff's constitutional rights, the Court need not address their qualified immunity argument.

### B.      Defendant Ritz

Defendant Ritz concedes that Plaintiff's complaints concerning his ears represented a serious medical need. However, Defendant Ritz argues there is no evidence he exhibited deliberate indifference because: he approved Plaintiff for off-site appointments on several occasions for other conditions; his decision to request more information before addressing the ENT referral request was a reasonable exercise of medical judgment; and he was entitled to rely on the opinion of Plaintiff's examining physician, Dr. Ahmed.

When considering whether a medical professional was deliberately indifferent, the Court must give deference to a medical professional's judgment regarding a treatment

decision unless "no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Stated differently, the plaintiff must show the decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such judgment." *Id.* Negligent conduct is not enough to establish deliberate indifference—rather, the conduct must approach "a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-22 (7th Cir. 2012).

Defendant Ritz first argues that because he approved Plaintiff for off-site treatment on other occasions, he must not have been deliberately indifferent to Plaintiff's health on this occasion. However, "even where a plaintiff has previously received good care, mistreatment for a short time might…be evidence of a culpable state of mind regarding deliberate indifference." *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999). Defendant Ritz's argument misses the mark.

Next, Defendant Ritz argues that deferring the ENT referral request until he received additional information and until Plaintiff was re-evaluated was a sound exercise of Defendant Ritz's medical judgment. "A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care. Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (internal citations and quotations omitted). "[I]f the need for

specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider deliberately indifferent to the inmate's condition." *Id.* at 412.

Defendant Ritz first became involved in the care of Plaintiff's ear condition on July 19, 2018, when he reviewed NP Stover's ENT referral request as part of the collegial review process.[5] It appears a collegial review was not actually held but Defendant Ritz did review the request. The document prepared in response to the referral request states: "38 y/o male who had multiple ear infections since March and has been treated with oral and IM antibiotics as well as ear drops. He has a long history of complicated ear infections and hearing loss is a risk factor if the ear infections continue this frequently. Reviewed by Dr. Ritz…" (Doc. 89-1, p. 3).

A collegial review does not involve an examination of an inmate but consists of a review of an inmate's relevant medical records. According to Wexford's guidelines, collegial reviews require all "supporting documentation" to be submitted to Defendant Ritz, including "ECG's, lab, previous studies and procedures, prior consultation notes, etc." (Doc. 95-1). Although Defendant Ritz testified he could not specifically recall which documents he reviewed pertaining to Plaintiff, he stated he would "typically review" the

---

[5] In Plaintiff's motion in opposition to Defendant Ritz's summary judgment motion, he points out criticism of Wexford's collegial process, in reference to the *Lippert* reports (Doc. 97, p. 12). The *Lippert* reports were expert reports from another case that critique Wexford's medical care, including the use of the collegial review process. Defendant Ritz contests the relevancy and admissibility of Plaintiff's arguments (Doc. 101, p. 1-2). The Court agrees that general criticism of the collegial process is not relevant to whether Defendant Ritz acted deliberately indifferent in these specific circumstances. Plaintiff has not brought a *Monell* claim against Wexford and, thus, its practices and policies are not under scrutiny.

"relevant history, exam findings, perhaps MARs, which are medication administration records reflecting what medications have been used and when. Imaging reports, if available. Hospital records, these types of things" (Doc. 88-1, p. 51-52). Plaintiff's medical records from the six months before the collegial reviews contain findings that included ear wax impaction, whiteish discharge, green drainage, and swelling and reddening of the ears; diagnoses of otitis externa and complicated otitis media; and prescriptions for six different antibiotics.

Although a question of fact exists as to exactly what records Defendant Ritz reviewed, it is undisputed that Defendant Ritz believed the records were incomplete because they did not contain Plaintiff's current exam findings, specify the antibiotics Plaintiff had been treated with, or state whether the antibiotics were DOT.  Thus, Defendant Ritz deferred making a decision on the ENT referral request until Plaintiff could be re-examined and until Defendant Ritz received more information concerning Plaintiff's antibiotics treatments. When Plaintiff's case was presented to Defendant Ritz again through the collegial process on July 26 and August 2, 2018, Plaintiff had still not undergone an examination. Thus, Defendant Ritz deferred making a decision again.

Because Defendant Ritz did not have complete information, his decision to defer the ENT referral request does not demonstrate deliberate indifference. The decision was occasioned by the need for more information, which does not exhibit a disregard for Plaintiff's condition. *See Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 965 (7th Cir. 2019) ("Dr. Obaisi made a reasonable medical judgment to delay referring Walker until

he had more information so that he could make a more informed referral request to UM."); *Saterfield v. Smith*, 2021 WL 1192698, at *7 (S.D. Ill. March 30, 2021) ("In light of the fact that Defendant Smith did not have complete information, the denial of this MRI referral does not demonstrate deliberate indifference."); *Robinson v. Lamb*, 2022 WL 1306267, at *12 (S.D. Ill. May 2, 2022) ("The Court finds that Dr. Ritz's denial of the ENT referral request in March 2016 was clearly not evidence of deliberate indifference. Dr. Ritz sought additional information prior to approving the request, and no additional information was received."); *Smith v. Butler*, 2021 WL 5217723, at *9 (S.D. Ill. Sept. 7, 2021) ("As this chain of events clearly shows, Dr. Ritz did not deny Dr. Trost's requests regarding Plaintiff. He simply requested additional information before giving the final approval, which is a reasonable position to take.").

However, Plaintiff points out that Wexford's policies do not require antibiotics to be administered DOT. Plaintiff suggests that Defendant Ritz should have approved the ENT referral regardless of how Plaintiff's antibiotics were administered. "[M]ere disagreement with a doctor's medical judgment" does not amount to deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (internal citations, alterations, and quotations omitted). A prisoner's dissatisfaction with a medical professional's treatment cannot support a deliberate indifference claim unless there is evidence the defendant "knew better than to make the medical decision" he made. *Id.* at 662-63. Sufficient evidence to support this inference may include "the obviousness of the risk from a particular course of treatment, the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment

decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Id.* at 663 (internal citations and quotations omitted).

There is no inference that Defendant Ritz "knew better" than to request more information on the administration of Plaintiff's antibiotics before addressing the ENT referral request. Defendant Ritz testified that knowing whether a full medication course was completed is especially important with antibiotics to evaluate their efficacy (Doc. 88-1, p. 102-03). Plaintiff does not identify a medical standard Defendant Ritz violated by requesting more information, no expert testified that Defendant Ritz's decision was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the inference. While Wexford's policies do not require antibiotics to be administered DOT, those policies do not supersede Defendant Ritz's independent medical judgment. Further, the record does not suggest that Defendant Ritz persisted in a course of treatment that was ineffective because he testified he could not determine the efficacy of Plaintiff's antibiotic treatment without more information. Plaintiff's mere disagreement with Defendant Ritz's decision to request additional information concerning the antibiotics treatment is insufficient to demonstrate deliberate indifference. *See Latham v. Mitcheff*, 651 Fed. App'x 523, 525 (7th Cir. 2016) (finding a prison doctor was not deliberately indifferent for requiring the plaintiff to switch to DOT before introducing a medication suggested by a cardiologist).

Defendant Ritz's relevant involvement with Plaintiff's medical treatment concluded on August 9, 2018, when Plaintiff' case returned to collegial. During collegial,

Dr. Ahmed told Defendant Ritz that Plaintiff had a TMJ problem and had no current need for an ENT. The referral request was withdrawn based on Dr. Ahmed's diagnosis, which Defendant Ritz testified was "clinically appropriate" (Doc. 88-1, p. 119). Defendant Ritz advised Lawrence that it could re-present Plaintiff's case to collegial as needed. Unfortunately, Plaintiff was later diagnosed with hearing loss.

Defendant Ritz contends he was not deliberately indifferent because he "must" rely on Dr. Ahmed's recommendations, as the on-site physician. Defendant Ritz does not cite any evidence to support this contention. He only testified that "in most cases" he does not oppose the recommendations and findings of the on-site physicians because they are "the ones who are managing the patients" (Doc. 88-1, p. 119). Thus, the relevant question is whether Defendant Ritz agreement to withdraw the ENT referral request was so far afield from accepted professional judgment, practice, or standards as to demonstrate a near total unconcern for Plaintiff's welfare.

When viewing the record in the light most favorable to Plaintiff, the Court assumes that Defendant Ritz reviewed Plaintiff's medical records as part of the collegial process. Defendant Ritz does not recall what documents he actually reviewed, but Wexford's policies and Defendant Ritz's practice indicate that he would have reviewed all of the relevant records during collegial review. A reasonable jury could certainly find from the circumstantial evidence that Plaintiff's medical records were relevant to the collegial review and reviewed by Defendant Ritz. Those medical records include objective findings of whiteish discharge from the left ears, red and swollen ear canals, ear wax

impaction, the presence of ants in both ears, dried drainage, tenderness, and a cloudy ear drum.

Defendant Ritz agreed that TMJ would not result in whiteish discharge, red or swollen ear canals, drainage, or ear wax impaction. However, he testified Dr. Ahmed's diagnosis was "clinically sound" (Doc. 88-1, p. 119). Dr. Ahmed noted marked tenderness of Plaintiff's TMJ when rendering the diagnosis. Defendant Ritz testified:

> Now, one of the things I would note is that probably one of the most important things, from my clinical experience, is documented in Dr. Ahmed's note here, and that's marked tenderness of the bilateral temporomandibular joint. And that's a very important documented finding, and most likely reflects why he made the diagnosis that he did.

(Doc. 88-1, p. 124).

Nothing in this record raises an inference that Defendant Ritz was deliberately indifferent. Defendant Ritz never examined Plaintiff and was limited to reviewing Plaintiff's records. Although those records contained objective findings inconsistent with TMJ, they also contain "one of the most important" findings in diagnosing TMJ— tenderness of the temporomandibular joint. And while Plaintiff now denies experiencing any tenderness, Defendant Ritz did not have this information or the benefit of conducting his own examination at the relevant times.   Instead, Defendant Ritz relied on the recommendation and diagnosis of Dr. Ahmed, who actually examined Plaintiff. Plaintiff argues Dr. Ahmed's examination was deficient and that the records do not document a proper physical examination to determine TMJ. But even if the TMJ diagnosis was faulty, the Seventh Circuit has repeatedly held that without more, the misdiagnosis of a medical condition does not constitute deliberate indifference. *Williams v. Guzman*, 346 Fed. App'x

102, 106 (7th Cir. 2009); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). At most, the record suggests negligence or malpractice. However, "[d]eliberate indifference requires more than evidence of negligence or medical malpractice." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017).

Further, the fact that Plaintiff was subsequently diagnosed with hearing loss is only relevant if Plaintiff can establish Defendant Ritz was deliberately indifferent. *Crawford v. OBaisi*, 2019 WL 7020497, at *5 (N.D. Ill. Dec. 20, 2019). "Once a plaintiff demonstrates deliberate indifference, he must also demonstrate causation in order to prevail." *Id.* (citing *Grayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). When a plaintiff alleges the defendant delayed medical treatment, the Seventh Circuit requires the plaintiff to present "verifying medical evidence" that the delay and not the underlying condition caused some harm. *Id.* (quoting *Walker v. Wexford*, 940 F.3d 954, 964 (7th Cir. 2019). Here, the Court need not reach the causation issue because the record does not support that Defendant Ritz was deliberately indifferent. Nonetheless, Plaintiff has not provided the necessary "verifying medical evidence" that Defendant Ritz's delay in treatment caused him additional harm.

Finally, Plaintiff cites several cases in support of his arguments, which are distinguishable from the circumstances here. In *McDonald v. Obaisi*, 2021 WL 3910754 (N.D. Ill. Sept. 1, 2021), the plaintiff's examining physician, the defendant, completed an urgent MRI referral form, waited three months to present the case for collegial review, determined during collegial that an alternative treatment plan should be developed

instead, and waited to sign off on the treatment plan until five months later. *Id.* at *2. The treatment plan was never developed, the defendant waited another two years to revive the MRI request, and he waited an additional month to present the case to collegial. *Id.* at *3. The plaintiff was approved for and received an MRI but the defendant did not review the results until two months after they were made available. *Id.* at *4. The district court denied the defendant's summary judgment motion because of the inexplicable delays that raised triable questions as to whether he exercised any professional judgment at all. *Id.* at *9.

In *Von Ryburn v. Obaisi*, 2020 WL 3868715 (N.D. Ill. July 9, 2020), *vacated in part on other grounds by Von Ryburn v. Obaisi*, 2022 WL 1444309 (N.D. Ill. May 6, 2022), the defendant physician treated the plaintiff on-site and acknowledged the plaintiff needed referrals to outside specialists on at least four occasions. The defendant referred the plaintiff to specialists three times but cancelled each of the referrals for various reasons, including the plaintiff had already seen a specialist within the past years, the plaintiff was previously non-compliant with a specialist, and the clinic the plaintiff was referred to would not accept inmates. *Id.* at *8, *9, and *11. The defendant also failed to follow the recommendations of a specialist that the plaintiff did see. *Id.* at *8. Each side's experts agreed the defendant did not exercise medical judgment when he failed to follow the recommendations of the specialist, *Id.* at *8, and the defendant's own expert testified the defendant should have referred the plaintiff to a specialist, *Id.* at *11. The district court denied the defendant's summary judgment motion. *See Id.*

In *Southard v. Wexford Medical*, 2019 WL 3330237 (S.D. Ill. June 6, 2019), report and recommendation adopted in part and rejected in part by *Southard v. Wexford Medical*, 2019 WL 3322364 (S.D. Ill. July 24, 2019), the district court denied summary judgment for an on-site physician who treated the plaintiff for five weeks before approving an ENT referral. During this time, the plaintiff repeatedly reported difficulty breathing and stated the treatment was not relieving his symptoms. *Id.* at *5. The court concluded that a jury could find the defendant persisted in a course of treatment that was ineffective, which could demonstrate deliberate indifference. *Id.*

In *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010), the Seventh Circuit reversed summary judgment in favor of a prison doctor where there was evidence the doctor knowingly adhered to an easier method to treat the plaintiff's tooth pain that she knew was ineffective. The doctor had not identified an effective pain medication and could not explain the plaintiff's pain, "yet she rejected the obvious alternative of referring" him to a dentist. *Id.* at 441. There was evidence the doctor would not refer the plaintiff to a dentist unless and until he presented a "dental emergency" or infection. *Id.*

In *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008), the Seventh Circuit reversed summary judgment in favor of a medical professional who refused to authorize a referral to a specialist or prescription-strength pain medication because he ignored recommendations from other doctors, testified that no pain experienced by any prisoner ever warranted prescription-strength painkillers, there was evidence the defendant revoked other minimal treatments after learning about complaints from the plaintiff

about his care, and the defendant testified he would not refer a prisoner to a specialist without knowing the cause of the alleged pain.

In *Jones v. Simek*, 194 F.3d 485 (7th Cir. 1999), the Seventh Circuit reversed summary judgment in favor of the defendant physician where the defendant told the plaintiff he had suffered nerve damage and promised an appointment with a neurologist but waited six months to actually refer the plaintiff. During this delay, the defendant refused to prescribe the plaintiff pain medication and treated him with "hostility." *Id.* at 488.

These cases are distinguishable from Plaintiff's case for a multitude of reasons. First, *Berry*, *Hayes*, *Greeno*, *Jones*, and *McDonald* did not analyze the collegial review process at all. The defendants in those cases were involved in examining the plaintiffs on-site and were not limited to record reviews like Defendant Ritz. And although the courts in *Von Ryburn* and *Southard* addressed the collegial review process, it was in the context of *Monell* claims, which are not alleged here.

Further, in the cases cited by Plaintiff, there were inexplicable delays that raised questions about whether the defendants were even exercising medical judgment. Here, Defendant Ritz explained that he delayed addressing the referral request because he needed additional information, which is undisputedly an exercise of medical judgment. Also, in the cases cited by Plaintiff, the evidence suggested the defendants either persisted with courses of treatment they knew were ineffective or delayed referrals they knew were necessary. As explained above, Defendant Ritz did not have enough information to

determine the efficacy of Plaintiff's treatments without a complete record and there is no evidence he ever acknowledged that an ENT referral was necessary before deferring or withdrawing the referral request. Also, in *Greeno*, *Von Ryburn*, and *Hayes*, the defendants refused to refer the plaintiffs to outside physicians for reasons that were blatantly wrong, such as waiting until the plaintiff showed signs of an emergency or infection, because the source of the plaintiff's pain was unidentified, or because the plaintiff had been noncompliant with another specialist. Here, Defendant Ritz's conduct was not obviously unsound—he deferred the referral request to receive additional information and then withdrew the request at Dr. Ahmed's recommendation. Further, in *Hayes* and *Jones*, the evidence suggested the defendant refused to refer the plaintiff to a specialist out of retaliation and hostility. There is no evidence here that Defendant Ritz deferred the referral request or withdrew the request out of an improper motive.

In sum, there is no evidence Defendant Ritz was deliberately indifferent to Plaintiff's medical condition. Defendant Ritz exercised his medical judgment when he requested additional information before addressing the ENT referral request. Then, Defendant Ritz withdrew the request at the recommendation and diagnosis of the physician who was treating Plaintiff in-person. Defendant Ritz's conduct does not raise any inference that he had a total unconcern for Plaintiff's welfare. Accordingly, Defendant Ritz is entitled to summary judgment.

<u>C</u><small>ONCLUSION</small>

For the reasons explained above, the Motion to File Summary Judgment Exhibits Under Seal filed by Defendant Stephen Ritz (Doc. 86) is **DENIED**. The Motion to File Summary Judgment Exhibit Under Seal filed by Plaintiff (Doc. 95) is **DENIED.** The Clerk of Court is **DIRECTED** to unseal Documents 89-1 and 95-1. The Motion for Summary Judgment filed by Defendant Stephen Ritz (Doc. 87) is **GRANTED**. The Motion for Summary Judgment filed by Defendant Kevin Kink and Andy Stout (Doc. 92) is **GRANTED**. Plaintiff's claims against Defendants are **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: June 16, 2022**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**